# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Lisa Tomasi, *et al.*,

        Plaintiffs,

v.

Township of Long Beach, *et al.*,

        Defendants.

Civil Action No.
3:14-cv-7319 (PGS) (LHG)

**MEMORANDUM
AND ORDER**

**SHERIDAN, U.S.D.J.**

    This matter comes before the Court on three motions: (1) a motion to dismiss filed by Defendant Township of Long Beach, (ECF No. 86); (2) a motion for summary judgment, filed by Defendant U.S. Army Corps of Engineers (Corps), (ECF No. 87), and (3) a cross-motion for summary judgment, filed by Plaintiffs Lisa Tomasi, Lydia Zinzi, and Jean Velten, (ECF No. 91). This action arises out of Defendant Long Beach's implementation of storm damage reduction measures on Plaintiffs' properties. Although Plaintiffs contend that the Defendants unconstitutionally seized their property, the claims brought are more nuanced. That is, Plaintiffs challenge a Corps condition, as applied to this project, that requires a non-federal sponsor of shore protection projects to provide public access to shorelines every one-half mile or less. Plaintiffs contend this requirement is arbitrary and capricious because it is beyond the statutory purpose under which it was promulgated; and was not adopted as a regulation of the Corps; and because Long Beach decided to acquire an easement on Plaintiffs' property because it sought to comply with the requirement, the taking was unconstitutional. To make sense of the factual allegations and

the legal issues which arise, it is necessary to understand the relevant legal background, which involves federal, state, and local governments.

<u>BACKGROUND</u>

<u>The Properties</u>

Plaintiffs own three adjacent lots in Long Beach Township, New Jersey, on a strip of land bordering the Atlantic Ocean, known in the planning documents as Tract 20.107. The lots are in an entirely residential unincorporated section of Long Beach known as Loveladies, which the record indicates is not a regular tourist destination and has no public restrooms or commercial facilities. Most Loveladies residences are seasonally occupied. Four public access points to the shore exist on this 1.5-mile long section of town. But they are spaced in such a way that the points to the north and south of Plaintiffs' properties are 0.68 miles apart. A preexisting private easement runs along the southwest border of the four properties "for the purpose of ingress and egress to and from Long Beach Boulevard." (*See* USACE 2373-2382; Second Amended Complaint, Ex. C, at 13, Ex. F).

*Figure 1:* Map of Loveladies. (*See* Plaintiffs' Brief in Opposition to Summary Judgment, ECF No. 91, at 10).



## Legal Backdrop

In 1986, the United States Congress approved Section 934 of the Water Resources Development Act, Public Law No. 99-662, 100 Stat. 4082 (1986) ("the 1986 Act"), authorizing federal financial participation in periodic beach nourishment for shore protection projects. *See* 33 U.S.C. § 426e. Privately owned shores are eligible for federal financial assistance "if there is benefit such as that arising from public use or from the protection of nearby public property." 33 U.S.C. § 426e(d). The statute charges the Secretary of the Army with "construct[ing], or caus[ing] to be constructed, any shore protection project authorized by Congress." 33 U.S.C. 426e(e)(3)(A).

In 1989, the Corps adopted Regulation Number 1165-2-130, entitled "Federal Participation in Shore Protection," which – implementing the 1986 Act – requires shorelines receiving federal funding to be open to the public. *See* Engineer Regulation 1165-2-130, Federal Participation in Shore Protection (June 15, 1989), at 6(a)(3)(d). The regulation provides, "Public use is a condition for Federal participation in hurricane, abnormal tide or lake flood protection projects." *Id.* at 6(h).

3

And, it defines public use as "use by all on equal terms," meaning, in part, "public access points . . . within one-half mile of each other." *Id.* at 6(h)(3), appx. A(14). Absent reasonable public access, "the cost sharing must be based on private use." *Id.*

Early Planning Stages

In a September 1999 planning document – the earliest cited document relating to this project – the Corps addressed public access in Loveladies, recognizing the need to bring that neighborhood into compliance with the Corps' regulation. (*See* USACE[1] 4972-4973). The document noted that Loveladies had insufficient public access for federal funding; stated that the nonfederal sponsor would need to acquire permanent easements for public access to bring Loveladies into compliance; and recommended several sites for such easements, including Plaintiffs' property (Tract 20.107). In the early planning stages of the project, the need for additional public access in Loveladies was noted in multiple documents, including: a March 3, 1999 Feasibility Study Real Estate Plan prepared by the Corps (USACE 4857-4863); an email exchange spanning June 30 to July 1, 1999, which appears to be between Corps employees (USACE 4770-4771); and two letters dated August 9 and 23, 1999, prepared by the NJDEP and addressed to the Corps (USACE 4725-4726; 4717-4723). Additional documents specified Plaintiffs' property as a potential location for a public access easement: a September 1, 1999 Feasibility Study Real Estate Plan (USACE 3643); a September 1999 Final Feasibility Report and Integrated Final Environmental Impact Statement (USACE 3506); a June 15, 2000 letter from the NJDEP indicating it had reviewed same (USACE 2400); and a September 24, 1999 map of the shore (USACE 3188). According to an internal memorandum from the Corps, around this time,

---

[1] Citations to USACE reference the administrative record, which has been provided to the Court in compact disc form. (*See* ECF No. 28-1).

the sponsor had indicated "that the municipalities [would] be doing the condemnations." (USACE 4852).

Congress then passed the Water Resources Development Act of 2000, Pub. L. No. 106-541, 114 Stat. 2572 (2000) ("the 2000 Act"), which authorized, among other things, a "project for hurricane and storm damage reduction [from] Barnegat Inlet to Little Egg Inlet, New Jersey," along with other projects across the country "in accordance with the plans, and subject to the conditions" described in the "Report of the Chief of Engineers dated July 26, 2000." Pub. L. No. 106-541 § 101(a)(1). That cited report proposed "sand dune and beach berm construction." It also required non-federal sponsors of the proposed projects – in this case the NJDEP – to "ensure continued conditions of public ownership and use of the shore upon which the amount of Federal participation is based" and to "[p]rovide and maintain necessary access roads, parking areas, and other public use facilities open and available to all on equal terms." Report of the Chief of Engineers, New Jersey Shore Protection Study, Barnegat Inlet to Little Egg Inlet (Long Beach Island), New Jersey, at ¶ 5(p), (q) (July 26, 2000). The NJDEP delegated responsibility for the condemnations to the municipalities, including Long Beach. (USACE 4852).

In an October 10, 2003 letter, the NJDEP referenced "new" public access locations in Lovelaides, located on Tracts 20.93 and 20.95 ("the alternative sites") rather than Plaintiffs' properties. (*See* USACE 2364-2367). On August 17, 2005, the NJDEP and the Corps entered into a Project Cooperation Agreement, which reiterated the need for public use of the shore and public use facilities "open and available to all on equal terms." (USACE 1791).

The record indicates the public access requirement remained an issue. A February 13, 2006 letter from the Corps to the NJDEP explained why the public access requirement could not be removed from the language of the easements to be required, citing the Corps Regulation and the

5

federal statutes. (*See* USACE 1720-1722). In 2006, due to resistance by residents of Loveladies and funding restraints, the Corps and the NJDEP reduced the scope of the project, excluding Loveladies altogether. (USACE 1714-1715). Long Beach continued to resist the Corps' public access requirement, as indicated by a December 10, 2009 email from a Corps representative to the mayor with the Corps regulation attached. (USACE 1669-1713).

<u>Hurricane Sandy and Recovery</u>

However, in October 2012, Super Storm Sandy struck the east coast, inflicting substantial devastation on New Jersey. In areas where the Corps' nourishment project had been completed, the dune and berm system successfully protected many coastal properties. (*See* Moore Cert., ECF No. 86-2, Ex. H, *Minke Family Tr. v. Twp. of Long Beach*, OCN-L-3033-14, at 3 (N.J. Sup. Ct. Law Div. Feb. 13, 2015), J, *Minke Family Tr. v. Twp. of Long Beach*, OCN-L-3033-14, at 2 (N.J. Sup. Ct. Law Div. Dec. 30, 2015). In areas, such as Loveladies, which had not implemented such projects, homes and properties suffered substantially increased damage. (*Id.*).

On September 15, 2013, the Governor of New Jersey issued an executive order directing the NJDEP "to acquire the necessary interests in real property to undertake Flood Hazard Risk Reduction Measures." *Executive Order No. 140* (Sep. 25, 2013), 45 N.J.R. 2289(a) (Oct. 21, 2013). The Corps, NJDEP, and Long Beach continued discussions about the project; the Corps – citing the 1989 regulation – continued to reiterate that it would not pay for construction unless the benefitted shoreline had adequate public access. (USACE 1255-1256).

On October 25, 2013, Long Beach provided a proposed public access plan to the NJDEP, which identified the alternative sites, and requested that NJDEP "review and advise if it is in compliance with the Corps public access requirements." (USACE 786). Five days later, the Corps circulated a modified draft real estate plan, which stated that public access is considered

insufficient where "available public access points to any particular shore are spaced approximately more than a half (1/2) mile apart." (USACE 760). It further noted that the "entire Long Beach Island Project area . . . meets the public access and parking requirements, except for a few non-contiguous small areas within Long Beach Township north and south of Harvey Cedars Borough." (USACE 760-761). However, the areas cited by the Corps as lacking sufficient public access did not include Plaintiffs' properties. (*See* USACE 17-28; Plaintiffs' Brief in Opposition to Summary Judgment, ECF No. 91, at 11).

In early January 2014, a Corps representative indicated that if public access is not finalized by the end of construction, the non-federal sponsor of the project "may have to pay 100 percent of the total costs of initial construction." (USACE 521). The NJDEP responded that it would advise the Corps of the finalized public access plan once it was worked out by Long Beach. (USACE 323-334). On March 13, 2014, Long Beach provided another plan to the NJDEP again proposing public access in Loveladies at the alternative sites. (USACE 317-322). The Corps contemplated revising the plan because the project still did not meet all public access requirements. (USACE 310).

On July 10, 2014, the NJDEP entered into an agreement with the Corps for "the placement of suitable beach fill to form a storm protection berm and a dune with planted dune grasses and sand fencing along the coastlines of a number of municipalities." (Second Amended Complaint, ECF No. 15, at ¶ 40; Certification of Christina M. Sartorio, Ex. A, Deposition of Mayor Joseph H. Mancini, at 87:10 to 88:6). In August 2014, Long Beach revised its public access maps and moved the proposed public access to Plaintiffs' properties, which did not affect the plan's compliance with public access requirements. Long Beach notified Plaintiffs of this revision in an August 15, 2014 letter. (Second Amended Complaint, Ex C). On September 26, 2014, Long Beach adopted

Ordinance 14-32, which authorized the acquisition of a public easement across Plaintiffs' property for public access from the road to the beach. (Second Amended Complaint, ¶ 75).

Procedural History

On November 25, 2014, Plaintiffs initiated this action in the District Court against Long Beach and the Corps and filed an amended complaint on February 3, 2015. About two months later, the Court dismissed the Amended Complaint because it was unclear whether Plaintiffs sought "to enjoin the implementation of the Real Estate Plan; or alternatively, to declare the Corps' engineering guidance regulations invalid" and the Corps was "not given fair notice of the substance of the Complaint in order to defend itself against same." (March 27, 2015 Order, ECF No. 14, at 1).

On April 27, 2015, Plaintiffs filed a second amended complaint. (Second Amended Complaint, ECF No. 15). On November 23, 2016, Plaintiffs filed a motion for a preliminary injunction seeking to enjoin the state condemnation action until the federal action was resolved. (ECF No. 62). This Court issued an order dated December 19, 2016, denying Plaintiffs' motion for a preliminary injunction. (ECF No. 68).

Before the injunction was resolved, Long Beach filed three condemnation actions against the Plaintiffs and filed a declaration of taking against their properties in the New Jersey Superior Court. Plaintiffs asserted a defense claiming the Corps' half-mile public access requirement was "never subject to the processes and procedures required by the Administrative Procedures Act [(APA)], such as a notice and comment period, and is ultra vires and unenforceable." (Harold Decl., Exs. N, at 7). On September 29, 2017, the Superior Court judge appointed commissioners to appraise the properties. Plaintiffs (who are defendants in the state-court action) appealed to the New Jersey Appellate Division. On October 20, 2017, the New Jersey Supreme Court granted a

motion filed by Plaintiffs to stay the underlying condemnation action pending the disposition of the appeal. On December 20, 2018, the Appellate Division affirmed, holding that Long Beach's actions were within its authority under state law. The stay was continued "for twenty days to give [the property owners] time to file a petition for certification and to seek a further stay from [the New Jersey] Supreme Court." *Twp. of Long Beach v. Tomasi*, A-0644-17, *et seq.*, 2018 WL 6683927 at 5 (D.N.J. Dec. 20, 2018).

## LEGAL ANALYSIS

### Abstention

Long Beach argues that the Court should decline to exercise jurisdiction over this action, relying on four separate abstention doctrines: *Rooker-Feldman*;[2] *Younger*;[3] *Colorado River*;[4] and *Thibodaux*.[5] "[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). "This duty is not, however, absolute." *Id.* "[F]ederal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest, for example, where abstention is warranted by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Id.* (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)).

### Rooker-Feldman

The *Rooker-Feldman* doctrine "precludes a United States District Court from exercising subject-matter jurisdiction" in an action previously resolved in state court. *Great W. Mining & Mineral Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 166 (3d Cir. 2010). It is this Court's critical

---

[2] *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).
[3] *Younger v. Harris*, 401 U.S. 37 (1971).
[4] *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).
[5] *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959).

task to "identify those federal suits that profess to complain of injury by a third party, but actually complain of injury 'produced by a state court judgment and not simply ratified, acquiesced in, or left unpunished by it.'" *Id.* (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)). In order to apply *Rooker-Feldman*, four elements must be established: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The second and fourth requirements are the key to determining whether a federal suit presents an independent, non-barred claim. *Great W. Mining & Mineral Co.*, 615 F.3d at 166 (internal citations omitted). Plaintiffs meet the first requirement because they lost in state court. There is also no dispute as to the timing of the judgment; the third factor.

As to the second factor, the issue recently decided by the New Jersey Appellate Division concerned whether a decision by Long Beach is properly based on a public purpose where its purpose is to avoid a financial obligation or obtain public funding. In contrast, the issue presented in this case concerns the conditions placed on the distribution of that funding by the Corps. Therefore, the Court concludes that the state court's decision did not in fact cause the alleged harm. Rather, the harm alleged in this action was caused by the Corps when it placed the condition on access to funding. In addition, the fourth prong of the *Rooker-Feldman* test is not satisfied here because Plaintiffs are asking that the Court overturn the Corps' requirement, not the state court's decision.

*Younger*

"*Younger v. Harris* . . . and its progeny espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). Abstention should be invoked rarely; "only 'in a few carefully defined situations.'" *Zahl v. Warhaftig*, 655 Fed. App'x, 66, 70 (3d Cir. 2016) (quoting *Gwynedd Props., Inc. v. Lower Gwynedd Twp.*, 970 F.2d 1195, 1199 (3d Cir. 1992)). "[I]n order for a district court to abstain under *Younger*, three requirements must be met: (1) there must be ongoing state proceedings that are judicial in nature; (2) the state proceedings must implicate important state interests; and (3) the state proceedings must provide an adequate opportunity to raise federal claims." *Dixon v. Kuhn*, 257 F. App'x 553, 555 (3d Cir. 2007) (citing *Anthony v. Council*, 316 F.3d 412, 418 (3d Cir. 2003)).

The first and second prongs of the test are satisfied. There is clearly an ongoing proceeding in state court. Further, the restoration and replenishment of beaches, as the parties appear to agree, is an important state interest. As to the third prong, the Court notes that Plaintiffs' "Fourth Separate Defense" to condemnation – that the Corps regulation is ultra vires and unenforceable – is identical to the issue raised herein. (*See* Moore Cert., Ex. T, at 7). However, as Plaintiffs correctly argue, the state court has "no jurisdiction over the legality of a requirement being enforced by a federal agency." (Plaintiffs' Opposition to Long Beach's Motion to Dismiss, ECF No. 90, at 7); *see Fed. Nat'l Mortg. Ass'n v. LeCrone*, 868 F.2d 190, 193 (6th Cir. 1989) (questioning "the propriety of permitting state courts to review the decisions of federal agencies under the APA"); *Kozera v. Spirito*, 723 F.2d 1003 (1st Cir. 1983) (recognizing that the waiver of sovereign immunity found in 5 U.S.C. § 702 "is expressly limited to actions brought 'in a court of the United States'").

Plaintiffs therefore could not raise their challenges to the Corps' requirement in the state-court action and the Court shall not abstain under *Younger*.

*Colorado River*

"The *Colorado River* doctrine allows a federal court to abstain, either by staying or dismissing a pending federal action, when there is a parallel ongoing state court proceeding." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton*, 571 F.3d 299, 307 (3d Cir. 2009). Whether abstention is appropriate requires a two-part inquiry: (1) "whether there is a parallel state proceeding that raises 'substantially identical claims [and] nearly identical allegations and issues'"; and (2) if so, "whether 'extraordinary circumstances' meriting abstention are present." *Id.* (quoting *Yang v. Tsui*, 416 F.3d 199, 204 n.5 (3d Cir. 2005); *Spring City Corp. v. Am. Bldgs. Co.*, 193 F.3d 165, 171 (3d Cir. 1999)). "If the proceedings are parallel, courts then look to a multi-factor test to determine whether 'extraordinary circumstances' meriting abstention are present." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307 (3d Cir. 2009). The six-factor test consists of:

> (1) [in an in rem case,] which court first assumed jurisdiction over [the] property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties.

*Id.* (quoting *Spring City Corp. v. Am. Bldgs. Co.*, 193 F.3d 165, 171 (3d Cir 1999)). "No one factor is determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." *Id.* (quoting *Colorado River*, 424 U.S. at 813).

Although the parallel state proceeding raises substantially similar claims, the Court finds the multifactor test weighs against *Colorado River* abstention. Plaintiffs filed the complaint in the

action before this Court on November 24, 2014, and the action in state court commenced nearly two years later, on November 15, 2016 (factors one and four). There is also nothing inconvenient about this Court exercising jurisdiction; the factual allegations all took place in New Jersey, the parties are from New Jersey, the properties in dispute are located in New Jersey, and the case involves a question of federal law (factor two). Although it is always desirable to avoid piecemeal litigation (factor three), Plaintiffs here challenge the Corps regulations; not the public purpose supporting Long Beach's condemnation. In addition, the constitutionality of the Corps' public access requirement is entirely a matter of federal law, and, as noted, it is doubtful that the state court is equipped to protect the parties' interest because it lacks jurisdiction to decide this federal question (factor six). The Court therefore declines to find that extraordinary circumstances merit abstention under *Colorado River*.

*Thibodaux*

"Under the *Thibodaux* abstention doctrine, a district court may abstain from exercising diversity jurisdiction to avoid deciding an unclear and important issue of state law bearing upon sovereign prerogative." *Aurelius Capital Master, Inc. v. MBIA Ins. Corp.*, 695 F. Supp. 2d 68, 73 (S.D.N.Y. 2010) (citing *Thibodaux*, 360 U.S. at 27-28). *Thibodaux* itself explicitly recognized "that eminent domain is a prerogative of the state, which on the one hand, may be exercised in any way the state thinks fit, and, on the other may not be exercised except by an authority which the state confers." *Thobodaux*, 360 U.S. at 26. The issues presented here involve questions of federal – not state – law; the validity of the Corps' requirement. The Court therefore shall decline to abstain under *Thibodaux*.

For the foregoing reasons, the Court shall decline to abstain from exercising jurisdiction over this action pursuant to any of the abstention doctrines raised in Long Beach's motion, and that motion shall be denied.

## Summary Judgment Standard

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010), *aff'd*, 408 Fed. App'x 383 (D.C. Cir. 2010); *see also Aybar v. Johnson*, 295 F. Supp. 3d 442, 451 (D.N.J. 2018). "[H]owever, when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 260 F.3d 1077, 1083 (D.C. Cir. 2001). "In a case involving review of a final agency action under the [APA], . . . the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007); *see also Uddin v. Mayorkas*, 862 F. Supp. 2d 391, 399-400 (E.D. Pa. 2012). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Stuttering Found. of Am.*, 498 F. Supp. 2d at 207.

## Final Agency Action

In its motion for summary judgment, the Corps contends it is entitled to judgment because there is no final agency action that is subject to this Court's review. Review of agency action is governed by the APA, which permits the Court to "hold unlawful and set aside agency action,

findings, and conclusions" under certain circumstances. 5 U.S.C. § 706(2). However, only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

For an agency action to be considered final, it must (1) mark the consummation of the agency's decisionmaking process"; and (2) be an action "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S.Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)) The Third Circuit has adopted a five-factor test to assess whether an agency action is final:

> 1) whether the decision represents the agency's definitive position on the question; 2) whether the decision has the status of law with the expectation of immediate compliance; 3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; 4) whether the decision involves a pure question of law that does not require further factual development; and 5) whether immediate judicial review would speed enforcement of the relevant act.

*Ocean Cnty. Landfill Corp. v. U.S. E.P.A., Reg. II*, 631 F.3d 652, 655 (3d Cir. 2011) (quoting *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003)).

The Court finds all factors weigh in favor of finding the June 2014 Corps-issued real estate plan to be a final agency action. First, the real estate plan is a definitive statement by the Corps applying its half-mile-public-access requirement to this project. Second, that decision has the status of law inasmuch as it imposes clear requirements upon which the receipt of federal funding hinges, and was accompanied by an expectation of immediate compliance if Long Beach wished to obtain the funding. Third, as the decision regarding the half-mile requirement directly led to the condemnation proceedings against Plaintiffs' properties, it clearly had an immediate impact on Plaintiffs' day-to-day operations. Fourth, the decision requires no further factual development; it interprets and applies the preexisting regulation to the nourishment project at Loveladies. And

finally, the Court's review would speed enforcement of the Water Resources Development Act; absent such review, the parties would continue wrangling over the meaning and enforceability of the Corps' requirement. The Court therefore concludes that the Corps' real estate plan is a final agency action subject to this Court's review.

Standing

"To ensure the proper adversarial presentation, a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "While generalized allegations of injury may suffice at the pleading stage, a plaintiff can no longer rest on such 'mere allegations' in response to a summary judgment motion, but must set forth 'specific facts' by affidavit or other evidence." *Pa. Prison Soc. v. Cortes*, 508 F.3d 156, 161 (3d Cir. 2007) (quoting *Lujan*, 504 U.S. at 561).

Plaintiffs have standing because the record clearly indicates the taking of their properties occurred because of the challenged regulation. It is clear that Long Beach ultimately decided to condemn Plaintiffs' properties based on the Corps' requirement of additional public access, (*See* Certification of Christina M. Sartorio, Ex. A, Deposition of Mayor Joseph H. Mancini at 51:2 to 25, 74:4 to 7, 106:10 to 12), which Long Beach initially resisted. A favorable decision for the Plaintiffs would enable Long Beach to reconsider the planned development, which would likely not result in the condemnation of Plaintiffs' property. Therefore, Plaintiffs have standing to challenge the Corps regulation.

## Time-Bar

The Corps next contends that Plaintiffs are barred from challenging the 1989 policy by the six-year statute of limitations "for civil actions against the United States under the Administrative Procedures Act." *Commonwealth of Pa. Dept. of Pub. Welfare v. U.S. Dept. of Health and Human Servs.*, 101 F.3d 939, 945 (3d Cir. 1996). As Plaintiff has made clear, this action challenges the 2014 real estate plan applying the 1989 regulation to their property, rather than the 1989 regulation itself. The challenge to the real estate plan is therefore timely. Moreover, regarding the 1989 regulation, the record indicates Plaintiffs did not have notice of same. There is no indication the property owners were privy to the communications that took place at the early stages of the project. Additionally, there is no evidence Plaintiffs owned the properties at that time; a tax assessment map from 2013 lists "Scammellot" as the property owner. (USACE 1628-34).

## Reasonableness of the Corps' Actions

On the merits of Plaintiff's claims, the Corps is entitled to summary judgment because its "incorporation of the 1989 Engineer Regulation's public access requirement into the [real estate plan] represents a clearly valid interpretation of its statutes." (Corps' Brief in Support of Summary Judgment, ECF No. 87-1, at 34). "The APA requirement that an agency rule go through notice and comment procedures applies only to so-called 'legislative' or 'substantive' rules, not to 'interpretive' rules." *Pa. Dept. of Human Servs. v. United States*, 897 F.3d 497, 505 (3d Cir. 2018). Whereas legislative rules "impose new duties upon the regulated party," *id.* (quoting *Chao v. Rothermel*, 327 F.3d 223, 227 (3d Cir. 2003), interpretive rules "seek only to interpret language already in properly issued regulations," *id.* (quoting *Elizabeth Blackwell Health Ctr. for Women v. Knoll*, 61 F.3d 170, 181 (3d Cir. 1995)).

A rule is interpretive if it "do[es] not add language to or amend language in the statute but 'simply state[s] what the administrative agency thinks the statute means, and only remind[s] affected parties of existing duties." *Id.* (quoting *SBC, Inc. v. F.C.C.*, 4124 F.3d 486, 498 (3d Cir. 2005)). The Third Circuit in *Pennsylvania Department of Human Services* found an agency rule that provided "a non-exhaustive list of costs that do and do not meet [the federal agency's] interpretation of the statute," to be interpretive of a federal statute requiring "that costs must be 'necessary . . . for the proper and efficient administration of the State plan.'" *Id.* Similarly, the half-mile-public-access rule is an interpretation of the statutory requirement that there be "benefit such as that arising from public use" for shores other than public, 33 U.S.C. § 426e, and was thus not required to go through the APA's notice and comment procedures. The 2014 real estate plan, in turn, applied the 1989 regulation to this project, and did so in a manner that was consistent with the regulation.

Because there was no notice and comment period, the Corps regulation and real estate plan do "not warrant deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); [they are], however, entitled to a degree of 'respect' under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944)." *Hayes v. Harvey*, 903 F.3d 32, 46 (3d Cir. 2018); *c.f., Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring) (cautioning against "abdication of the Judiciary's proper role in interpreting federal statute" when courts employ "reflexive deference" to administrative agencies). Under *Skidmore*, Courts employ "a sliding scale approach," where deference is given to the agency's interpretation "based on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* (citations and internal quotation marks omitted); *see also Vance v. Ball*

*State Univ.*, 570 U.S. 421, 431 n.4 (2013). "[T]he most important considerations are whether the agency's interpretation is consistent and contemporaneous with other pronouncements of the agency and whether it is reasonable given the language and the purpose of the Act." *Id.* (citations and internal quotation marks omitted) (alterations in original).

Applying *Skidmore* deference to the real estate plan, the Court finds it to be reasonable. The real estate plan is consistent with the longstanding agency regulation requiring public access every half-mile. That regulation was initially enacted in 1989; Congress has enacted several subsequent amendments to the Water Resources Development Act without contradicting or overturning that regulation. *See, e.g.*, Water Resources Development Act of 2016, Pub. L. No. 114-322, 130 Stat. 1632 (2016); Water Resources Development Act of 2007, Pub. L. No. 110-114, 121 Stat. 1041 (2007); Water Resources Development Act of 2000, Pub. L. No. 106-541, 114 Stat. 2572 (2000). The requirement in the real estate plan is therefore consistent and contemporaneous with the agency's other pronouncements.

In addition, the requirement is consistent with the statute, which requires a "benefit such as that arising from public use" for projects implemented on "[s]hores other than public," 33 U.S.C. § 426e(d), and also requires that "all costs assigned to benefits to privately owned shores (where use of such shores is limited to private interests) or to prevention of losses of private lands . . . be borne by non-Federal interests," 33 U.S.C. § 2213(d)(1). The statute does not define "privately owned shores," "shores other than public," or "benefit such as that arising from public use." *See* 33 U.S.C. § 426h-1, 2219, 2241. The word "use" of the shores, appearing in section 426e(d) and the parenthetical in section 2213(d)(1), suggest an emphasis on the public's ability meaningfully use the shores, rather than actual physical ownership by the public. It was therefore reasonable, for

the Corps to impose the half-mile public access requirement to ensure that the public could make meaningful use of the shores that received funding.[6]

<u>Long Beach's Compliance with the 2014 Real Estate Plan</u>

Plaintiffs next argue that Long Beach violated the real estate plan by moving the proposed public access point in Loveladies from the alternative sites to their properties. As is evident from the administrative record, public access is a longstanding issue. The Corps repeatedly informed Long Beach that an additional public access point was necessary to bring that segment of the shore into compliance with the regulation. In March 2014, Long Beach sought approval to place public access points at the alternative sites in Loveladies. In June 2014, the Corps approved the proposed public access in the real estate plan, which this Court has concluded was a final agency action, but noted that additional public access was required elsewhere on the shore. In August 2014, Long Beach revised the public access map, moving the proposed public access to Plaintiffs' properties.

Plaintiffs now contend that "the Corps cannot permit the Township to proceed in direct violation of the [real estate plan]." (Plaintiffs' Brief in Support of Cross Motion for Summary Judgment, ECF No. 91, at 25). The APA permits the Court to "'hold unlawful' agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Hondros v. United States Civil Serv. Comm'n*, 720 F.2d 278, 297 (3d Cir. 1983) (quoting 5 U.S.C. § 706(2)(a)). "[W]hen an agency arbitrarily or capriciously withholds action, we may 'compel' the agency to act under this section." *Id.* at 298. A claim to compel agency action "can proceed only

---

[6] The Court also notes that an analogous section of the Water Resources Development Act, which authorizes the Secretary of the Army to "carry out a program for the construction of small shore and beach restoration and protection projects not specifically authorized by Congress that otherwise comply with section 426e." 33 U.S.C. § 426g(a)(1). Such projects may, however, only be carried out on "privately owned site[s] with substantial public access" or "publicly owned site[s] on open coast or in tidal waters." 33 U.S.C. § 426g(b)(2)(D)(i). This section further supports the Court's conclusion that it was reasonable for the Corps to require public access every half-mile.

where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

Plaintiffs are incorrect that the Corps should be ordered to stop Long Beach from proceeding with condemnation of property not explicitly named in the real estate plan. There is no indication that the Corps is required to act in such a manner. The Corps merely provides funding subject to its public use requirement. Its inaction with regard to Long Beach moving the public access easement has a plain explanation; moving the easement did not affect Long Beach's compliance with the Corps' underlying requirement. In addition, when asked about the August 2014 revision during his deposition, Mayor Mancini proffered a legitimate reason for moving the easement location and testified that he took steps to prevent his own bias from impacting the decision:

> [T]he engineer and the appraiser said that their latest correction would be easier, because there was an existing access easement straight from the Boulevard to the flat beach itself, the Minkes had like a retaining wall and it was existing; so it would have been a much easier, we wouldn't have had to damage any landscaping or growth as opposed to the previous one they had picked.
>
> So they said it was going to be a simpler matter to do that, and I didn't ask them who owned it. I didn't ask anybody during the whole process who owned it. I have a lot of friends up there. I didn't want to –

(Mancini Dep., at 95:5 to 18). Although he did not finish the sentence, Mayor Mancini's meaning was clear; he sought to shield the decision from any improper influence.

The real estate plan emphasized the need for public access every half mile. Though it charged Long Beach with condemning properties and named the alternative sites as the public access locations, there is no *discrete* requirement in the real estate plan or its corresponding regulation *requiring* the Corps to take legal action ensuring public access in the precise location

specified. Therefore, the Court finds it would be improper to order the Corps to require Long Beach to commence a condemnation proceeding at the alternative sites.

## ORDER

The Court has considered the written submissions of the parties and held oral argument on the matter on November 20, 2018. Accordingly, for the reasons stated herein and for good cause shown;

**IT IS** on this _31_ day of January, 2019,

**ORDERED** that the motion to dismiss filed by Defendant Township of Long Beach, (ECF No. 86), is denied; and it is further

**ORDERED** that the motion for summary judgment filed by Defendant United States Army Corps of Engineers, (ECF No. 87), is granted; and it is further

**ORDERED** that Plaintiffs' cross-motion for summary judgment, (ECF No. 91), is denied; and it is further;

**ORDERED** that judgment be entered in favor of Defendants and that the Clerk's Office shall close the case.

_____
PETER G. SHERIDAN, U.S.D.J.